# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

Before
**K.J. BRUBAKER, M.C. HOLIFIELD, A.Y. MARKS**
Appellate Military Judges

## UNITED STATES OF AMERICA

v.

## DUSTIN M. JOHNSTON
## CORPORAL (E-4), U.S. MARINE CORPS

## NMCCA 201400338
## GENERAL COURT-MARTIAL

**Sentence Adjudged:** 2 May 2014.
**Military Judge:** LtCol Leon Francis, USMC.
**Convening Authority:** Commanding General, I Marine Expeditionary Force, U.S. Marine Corps Forces Pacific, Camp Pendleton, CA.
**Staff Judge Advocate's Recommendation:** Col S.D. Marchioro, USMC.
**For Appellant:** LT Christopher C. McMahon, JAGC, USN.
**For Appellee:** Capt Cory A. Carver, USMC; LT Amy Freyermuth, JAGC, USN.

### 21 January 2016

---------------------------------------------------
### PUBLISHED OPINION OF THE COURT
---------------------------------------------------

MARKS, Judge:

A panel of members with enlisted representation, sitting as a general court-martial, found the appellant guilty, contrary to his pleas, of four specifications of sexual abuse of a child and one specification of indecent exposure, in violation of Articles 120b and 120c, Uniform Code of Military Justice, 10 U.S.C. §§ 920b and 920c. The members sentenced the appellant to eight months' confinement, reduction to pay grade E-1, total forfeitures, and a bad-conduct discharge. The convening authority approved the sentence as adjudged.

The appellant raised four assignments of error (AOE), three in his original brief and one as a supplemental AOE:

1. The evidence is legally and factually insufficient to sustain a conviction for indecent exposure under Article 120c, UCMJ.

2. Article 120c, UCMJ, is overly broad and void for vagueness, both facially and as applied.

3. The Government unreasonably multiplied charges against the appellant by charging a single series of text messages sent during a half-hour period as two specifications of committing a lewd act upon a child.

4. The evidence is legally and factually insufficient to sustain a conviction for indecent exposure under Article 120c, UCMJ, because the statute does not apply to digital images.

We find the evidence of indecent exposure factually insufficient and take corrective action in our decretal paragraph. This moots the issue of legal insufficiency of the indecent exposure offense as well as the second and fourth AOEs listed above. We find no unreasonable multiplication of charges. Following our corrective action, we find that no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ.

**Background**

The appellant met A.C. through an online social networking application in the fall of 2012. They chatted using the application's messaging function for a day or two, and the appellant shared his phone number with A.C. Days later, A.C. resumed contact with the appellant by sending a text message to his phone number. From October 2012 until 12 January 2013, the appellant and A.C. exchanged approximately 2,000 text messages. The content of their messages ranged from the mundane to graphic verbalizations of sexual fantasies, commonly known as "sexting." They also exchanged photos. A.C. sent the appellant six photos of herself, none of which was sexually explicit. At least two of the photos the appellant sent A.C. featured his exposed, erect penis.

Throughout their electronic relationship, A.C. was 14 years old, and the appellant was 19 years old. The appellant asked A.C. her age shortly after meeting her online, and A.C. replied she was 17. On or about 31 December 2012, A.C. informed the appellant she was in fact 14 years old. He reacted with what she interpreted to be anger. Communication between the appellant and A.C. stopped for a few days. But the appellant resumed the texting and sexting with A.C. and sent her at least one more picture of his penis. On 12 January 2013, A.C.'s mother intercepted a text from the appellant and began exchanging messages with the appellant while impersonating A.C.. A.C.'s mother alerted Marine Corps law enforcement, and all contact between the appellant and A.C. ended. During the ensuing Naval Criminal Investigative Service

2

(NCIS) investigation, NCIS recovered all or part of nearly 2,000 text messages between the appellant and A.C. as well as the photos.

The appellant was charged with indecent exposure under Article 120c for a photo he sent between 1 and 31 December 2012.[1]  For a photo shared between 1 and 12 January 2013, the appellant was charged with violation of Article 120b, sexual abuse of a child, by intentionally exposing himself.  The Government charged four additional specifications in violation of Article 120b for 13 of appellant's sexually explicit text messages.

**Analysis**

*Factual Sufficiency*

We review issues of factual sufficiency *de novo*.  Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)).  The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are ourselves "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).  "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399.

*Indecent Exposure*

Article 120c(c), UCMJ, prohibits indecent exposure, as defined by three elements:

(1)     The appellant exposed his or her genitalia, anus, buttocks, female areola, or female nipple;

(2)     That such exposure was intentional; and,

(3)     That such exposure was done in an indecent manner.

10 U.S.C. § 920c(c).  Unlike prior versions, this statute requires neither a public setting nor a public view.[2]  By removing such an element, Congress sought to criminalize "situations in which

---

[1] Second Additional Charge II, Specification.

[2] From 1 October 2007 until 27 June 2012, Article 120(n), UCMJ, prohibited indecent exposure with the same three elements above plus an additional element requiring public visibility: That the exposure occurred "in any place where the conduct involved may reasonably be expected to be viewed by people other than members of the actor's family or household."  10 U.S.C. § 920(n) (2007).  Prior to 1 October 2007, indecent exposure was a violation of Article 134, UCMJ, requiring "[t]hat the accused exposed a certain part of the accused's body *to public view* in an indecent manner[.]"  MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.), Part IV, at ¶ 88 (emphasis added).  As an Article 134 offense, pre-2007 indecent exposure also included the terminal element "that, under the circumstances, the accused's conduct was to the prejudice of good order and discipline in the armed forces or was of

the exposure is indecent – even if committed in a place where it would not be reasonably be [sic] expected to be viewed by people other than the members of the actor's family or household." MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), App. 23, at ¶ 45c.a. This amendment reflected the Court of Appeals for the Armed Forces' (CAAF) more expansive interpretation of indecent exposure in *United States v. Graham*, 56 M.J. 266 (C.A.A.F. 2002), discussed infra. It also left "an indecent manner" as the only element making intentional exposure criminal.

Article 120c(d)(6) defines indecent manner as "conduct that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." Under past definitions, a public setting made indecent exposure easy to distinguish from other intentional exposure. Intentional exposure in a public place will still satisfy the element of indecency in most cases, but we must now consider how exposure in a more private setting might violate the new statute. We turn to case law for objective factors to help define the parameters of an indecent manner. Three factors emerge as hallmarks of indecent conduct: (1) lack of consent; (2) involvement of a child; and/or (3) public visibility.

### 1. Consent

Even in the most private of settings, the presence or absence of consent can determine whether an intentional exposure is indecent. The official analysis of the new Article 120c reveals that Congress "intended to criminalize *non-consensual* sexual misconduct that ordinarily subjects an accused to sex offender registration." MCM (2012 ed.), App. 23, at ¶ 45c (emphasis added). Congress' change reflected the evolution of indecent exposure jurisprudence in the military courts.

Ten years earlier, in *Graham,* the CAAF upheld a conviction for indecent exposure that occurred in a private setting because of the witness's lack of consent. 56 M.J. at 266. In *Graham*, the appellant invited his 15-year-old babysitter into his bedroom after he stepped out of the shower. Then he let a towel wrapped around his waist drop to the floor, exposing his penis to her. *Id*. at 267. Graham challenged the factual and legal sufficiency of his conviction because the applicable indecent exposure statute required public view of the accused's body. *Id*. at 266-67 (citing MCM (2000 ed.), Part IV, at ¶ 88b). The CAAF found that Graham's exposure still violated the statute because:

> [h]e did not expose himself to his spouse or girlfriend, or to a family member or other person involved with him in such a way that a given exposure might not be indecent. Appellant exposed himself to a fifteen-year-old girl who was completely unrelated to and uninvolved with him, and who neither invited nor consented to his conduct.

---

a nature to bring discredit upon the armed forces." Our analysis does not focus on the removal of the terminal element.

4

. . . .

Appellant exposed himself in the bedroom of his home - clearly a nonpublic place. But he did so "willfully . . . by inviting his babysitter into the bedroom and then allowing his towel to drop in front of her." [And in] this way, he made certain that an unsuspecting and uninterested member of the general population had no choice but to see him naked. That is indecent exposure, and as a result, appellant was properly convicted under this Court's precedent.

*Id*. at 267-68. Lack of consent made private exposure indecent.

On the other hand, invitation and consent can be equally dispositive in finding intentional exposure is not indecent. Unlike the 15-year-old babysitter in *Graham*, the victim of indecent exposure in *United States v. Hockemeyer*, No. 200800077, 2008 CCA LEXIS 310, *8, unpublished op. (N.M.Ct.Crim.App. 2008) "was neither 'unsuspecting' nor 'uninterested.'" (quoting *Graham*, 56 M.J. at 268). Over a live, online video feed, Hockemeyer exposed his penis to an undercover NCIS special agent posing as a 13-year-old girl named "Raven." *Id*. at *3. Hockemeyer was alone in front of his computer at home, and the NCIS agent posing as "Raven" was alone at her computer as well. *Id*. at *6. While this court found the NCIS agent to be a member of the public, the online chat between "Raven" and Hockemeyer immediately preceding his exposure evidenced her consent. *Id*. at *3. Finding that Hockemeyer exposed himself to an adult who had expressed her consent, the court concluded there was an inadequate factual basis to Hockemeyer's plea to indecent exposure, set aside the guilty finding, and dismissed the charge and specification. *Id*. at *8.

*2. Age*

Regardless of consent, determination of indecency also requires consideration of age. Sexual abuse of a child includes intentionally exposing oneself "to a child [who has not attained the age of 16 years] by any means, including via any communication technology, with an intent to abuse, humiliate, or degrade any person, or to arouse the sexual desire of any person." 10 U.S.C. § 920b(h)(5)(B). Intentional exposure before a child may also constitute indecent exposure in violation of Article 120c(c), but our superior court has warned us that minority of age does not, by itself, equate to indecency. The fact finder must analyze the specific circumstances of a case before finding an indecent manner.

In *United States v. Baker*, 57 M.J. 330, 331 (C.A.A.F. 2002), the CAAF reversed a 19-year-old Airman's conviction for indecent acts with a 15-year-old girl. During deliberations, a member of the general court-martial panel asked the military judge a question about the definition of "indecent." *Id*. at 332. The CAAF found the military judge committed plain and prejudicial error by failing to give additional tailored instructions on the meaning of indecent. *Id*. at 335-36. A properly tailored instruction would direct members to consider all facts and circumstances of a case before finding indecency. *Id*. at 336. According to the CAAF, the military judge in *Baker* should have advised that the "appellant's youthful age, the proximity in age between appellant and [the alleged victim], their prior relationship, and the alleged victim's

5

factual consent were circumstances that could be considered in deciding whether the charged acts were indecent." *Id.*

The CAAF also clarified that sexual conduct between a service member and a child under the age of 16 is not *per se* indecent. *Id.* at 335; *see also United States v. Strode*, 43 M.J. 29, 32 (C.A.A.F. 1995). In *Strode*, the CAAF affirmed the United States Air Force Court of Military Review's decision to set aside a guilty plea to indecent acts with a 13-year-old because of a mistake of fact as to age. *Id.* at 32. During the providence inquiry, Strode testified that at the time of the indecent act he believed the victim was at least 16 years old. *Id.* at 31. The military judge erred by disregarding the mistake of fact as to age as irrelevant. *Id.* at 32. The CAAF held that "[m]istake of fact is available to a military accused who is charged with committing indecent acts with a child under the age of 16 if he had an honest and reasonable belief as to the age of the person *and* if the acts would otherwise be lawful were the prosecutrix age 16 or older." *Id.* at 33. Mistake of fact as to age remains an affirmative defense to sexual abuse of a child under Article 120b. MCM (2012 ed.), App. 23, at ¶ 45. Reasonably mistaking a minor for an adult is also relevant to a determination of an indecent manner.

### 3. *Public vs. Private*

Whether exposure is public or private is the third factor relevant to a determination of indecency. Although no longer a requirement for indecent exposure, a public setting can still render the manner of exposure indecent. On the other hand, a non-public setting can afford protection for adults engaging in consensual sexual conduct even if others may consider it indecent.

*Right to Consenting Adults' Private Behavior*

Just as the absence of consent, adulthood, or privacy may render sexual conduct indecent, the presence of those three factors can shield the same conduct from criminal liability.

The Supreme Court's opinion in *Lawrence v. Texas*, 539 U.S. 558 (2003) nullified a state law criminalizing homosexual sodomy and describing it as "'deviate sexual intercourse with another individual of the same sex.'" *Id.* at 563 (quoting Tex. Penal Code Ann. § 21.06(a)(2003)). The court acknowledged:

> [T]hat for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives.

*Id.* at 571. Despite the long history of social and religious denunciation of sodomy, the Court noted that prosecutions were usually limited to "predatory acts against those who could not or did not consent" or conduct in a public space, not "consenting adults acting in private." *Id.* at 568-71. Ultimately, the Court invalidated the Texas statute, finding a liberty right under the Due

Process Clause for consenting adults to engage in private sexual conduct without intervention of the government. *Id*. at 578.

Interpretations of what makes conduct indecent, and therefore criminal, must account for the liberty interests of consenting adults acting in private. Fact finders applying the definition of an indecent manner to intentional exposure must consider the totality of the circumstances, *see Baker*, 57 M.J. at 336, including this non-exclusive list of factors: (1) the presence or absence of consent, (2) age and whether the accused had a reasonable mistake of fact as to age, and (3) whether the conduct occurred in a public or private setting.

*Application*

With these three factors in mind, we review the factual sufficiency of this record, beginning with evidence of consent or a lack thereof.

The recovered text messages between A.C. and the appellant reveal dialogue typical of two adolescents in a romantic relationship. They frequently referred to each other as "my love" and "baby" and shared mundane details of their days from haircuts to a trip to the DMV to the weather, movies, and what they were eating. During one conversation, A.C. complained to the appellant, "I need you a lot right now I've never felt like this, dependant [sic] on another person but right now I really need your arms to hold me,"[3] and the appellant attempted to comfort and cheer her. Although the appellant and A.C. did not go on dates, A.C. twice left home under false pretenses to meet the appellant in a nearby park. They sat and talked for about an hour, and the appellant kissed her. The 12 January 2013 text messages between the appellant and A.C.'s mother, posing as A.C., revealed the appellant's assumption that he was A.C.'s only boyfriend.

The messages also depict A.C. as a willing and active participant in graphic sexual fantasies shared via text, or "sexting." She invited, encouraged, and reciprocated the appellant's verbalizations of oral sex and sexual intercourse with her, often pressing him for details.[4] Regardless of their sincerity, A.C. repeatedly made explicit sexual overtures to the appellant.[5] Her proposals evinced willingness to do more than simply view the appellant's naked body. The dates associated with two of these text messages reveal that A.C. sent them *after* receiving at least one picture of the appellant's penis.

Admittedly, there is no evidence A.C. explicitly requested a photograph of the appellant's exposed penis. Among nearly 2,000 recovered text messages there is only one reference to an image of an exposed penis, or "d--k pic." On 11 January 2013, A.C. seemed to solicit a picture of the appellant's penis then immediately and clumsily retracted it:

---

[3] Defense Exhibit C at 17.

[4] Prosecution Exhibit 11 at 2; DE C at 1, 2, 5, 9.

[5] DE C at 2, 11, 13, and 24; PE 11 at 2-3.

D--k pics lol
Send me one lol I don't have a d--k
Jk I'm fine
U wana d--k pic
Haha maybe later just for me (:[6]

By that date in their relationship, A.C. had already received the photos for which appellant was charged. It is also significant that minutes after this exchange, A.C. mentioned she was taking a bath and invited the appellant to join her.

The volume and intimacy of the text messages between A.C. and the appellant are evidence of a virtual but sexually charged relationship. Unlike the towel-clad father and babysitter in *Graham*, the appellant and A.C. were involved with each other, embracing roles as boyfriend and girlfriend in their intimate texted conversations.

The sustained volleys of sexually explicit messages and A.C.'s repeated requests for details of imagined sexual encounters with the appellant are inconsistent with claims that photos of the appellant's penis came without her invitation or consent. During the court-martial, trial counsel asked A.C. how she felt when she first received a photo of the appellant's penis in December 2012. She responded, "It was uncomfortable and I – yeah. I didn't like it very much."[7] But the Government introduced no evidence that A.C. communicated this discomfort or any lack of consent to the appellant. A.C. testified that she admitted her real age to the appellant, hoping he would leave her alone. However, when he resumed his texts, she resumed her role as his sexting partner. In fact, A.C. testified that she maintained the sexually explicit status quo: "I just felt like I had to keep going with whatever I had done."[8] On balance, the sustained and explicit sexual banter between A.C. and the appellant overwhelms the limited evidence that A.C. did not consent to the appellant's intentional exposure of his penis.

We proceed to the ages of the appellant and the victim, 19 and 14 respectively. Sexual conduct with a child under 16 is not indecent *per se*. *See Baker*, 57 M.J. at 335; *Strode*, 43 M.J. at 32. And as previously discussed, mistake of fact as to age is a defense to sexual abuse of a child, which includes intentional exposure before a child. *See* 10 U.S.C. § 920b. Indecent exposure under Article 120c(c) makes no reference to age or minority, prohibiting only intentional exposure in an indecent manner. Still, age is relevant to determinations of indecency as is a reasonable mistake of fact as to age. *See Strode*, 43 M.J. at 32.

The Government essentially conceded that the appellant reasonably believed A.C. was 17 years old throughout December 2012, the period encompassed in the specification at issue. During direct examination, A.C. testified that she told the appellant she was 17 years old shortly

---

[6] PE 16 at 47; DE C at 30-31. These text messages were recovered without data indicating who sent them, but the content allows one to reasonably conclude who sent them.

[7] Record at 690.

[8] *Id.*

after they met in October 2012.  Not until 31 December 2012 did she admit her true age in a single text message to the appellant: "I'm 14."[9]  Trial counsel prefaced his direct examination of A.C. about the December 2012 indecent exposure by saying, "Now I want to go back to that period before you told him that you were 14."[10]  The Government introduced no evidence challenging the reasonableness of the appellant's belief about A.C.'s age before 31 December 2012.  We are left with unrefuted evidence supporting the appellant's reasonable mistake of fact as to A.C.'s age during the period charged in the specification.

Finally, we turn to potential public exposure to the appellant's photo.  The Government presented no evidence A.C. or the appellant shared or posted these photos of the appellant's penis online or that anyone other than A.C. saw them.  Fearful of her mother's regular inspection of her smartphone, A.C. carefully deleted all texts and photos from the appellant.

Returning to the elements, the Government proved through the photographs themselves that the appellant intentionally exposed his penis.  The evidence, however, leaves us unconvinced that he exposed himself in an indecent manner.  The photograph's "tend[ency] to excite sexual desire" is apparent from the relationship and pattern of sexting surrounding it.  But the evidence points to private conduct toward someone he reasonably perceived to be a consenting adult.  This case has none of the three hallmarks of indecency but all three of the factors comprising the liberty interest identified in *Lawrence*.  Consent, age (or a reasonable mistake of fact as to age), and privacy leave us with a reasonable doubt that the appellant's conduct was indecent.  Therefore, we set aside the finding of guilty to the Second Additional Charge II and its sole specification, violation of Article 120c(c) from 1-31 December 2012, for factual insufficiency.

Our ruling obviates the need to determine the issue of the legal sufficiency of this conviction and moots the second and fourth AOEs listed earlier in this opinion.

*Unreasonable Multiplication of Charges*

The appellant alleges that Specifications 3 and 4 of Additional Charge I[11] present an unreasonable multiplication of charges and should be merged for findings and sentence.  Neither in their Motion to Dismiss Multiplicious Specifications[12] nor during trial did trial defense counsel object to these two specifications as an unreasonable multiplication of charges.  Thus they forfeited the issue.  Although forfeiture of an allegation of error normally requires the appellant to show plain error, the widely used *Quiroz* test for unreasonable multiplication of

---

[9] *Id.* at 689.

[10] *Id*. at 690.

[11] After the withdrawal and dismissal of Additional Charge II, Additional Charge I should have been renamed simply Additional Charge but was not.  For consistency and clarity, we will refer to it as Additional Charge I.

[12] Appellate Exhibit III.

charges incorporates forfeiture of the issue. *See United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009); *cf. United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001).

RULE FOR COURTS-MARTIAL 307, MCM (2012 ed.) provides guidance on the preferral of charges and specifications, and paragraph (c)(4) directs that "[e]ach specification shall state only one offense. What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person."

In *Quiroz*, with one minor exception, the CAAF ratified this court's "'framework for determining whether a given multiplication of charges arising from the same act or transaction, while permissible under *Teters*[13], is nevertheless "unreasonable.""" 55 M.J. at 338 (quoting *United States v. Quiroz*, 53 M.J. 600, 607 (N.M.Ct.Crim.App. 2000)). The following factors help us to determine whether there is an unreasonable "piling on" of charges or specifications:

(1)    Did the accused object at trial that there was an unreasonable multiplication of charges and/or specifications?

(2)    Is each charge and specification aimed at distinctly separate criminal acts?

(3)    Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?

(4)    Does the number of charges and specifications unreasonably increase the appellant's punitive exposure?

(5)    Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*Id*.

The appellant's trial defense counsel filed a Motion to Dismiss Multiplicious Specifications but failed to object to Specifications 3 and 4 of Additional Charge I. Thus, this first factor of the *Quiroz* test weighs in the Government's favor. *See United States v. MartinezMaldonado*, 62 M.J. 697, 699 (N.M.Ct.Crim.App. 2006).

The second factor is whether each charge and specification is aimed at a distinctly separate criminal act. Over a half hour period on a single day, the appellant sent eight lewd texts to A.C. Specifically, the messages arrived at 23:28:00, 23:38:40, 23:41:39, 23:43:36, 23:48:57, 23:51:28, 23:54:52, and 23:55:44.[14] The Government divided them into Specifications 3 and 4, alleging the first four text messages in one specification and the last four in the other.

---

[13] *United States v. Teters*, 37 M.J. 370, 377-78 (C.M.A. 1993) (holding that convictions for multiple offenses arising from the same act or transaction are authorized absent Congressional intent to the contrary).

[14] PE 11 at 2.

We disagree with the Government that Specifications 3 and 4 address distinct criminal purposes simply by incorporating different messages. In *United States v. Campbell*, 71 M.J. 19, 24-25 (C.A.A.F. 2012), the CAAF distinguished among Campbell's decisions to access prescription medications without authority and under false pretenses, to form the intent to steal medications, and then to retain those stolen medications and found "each implicated multiple and significant criminal law interests, none necessarily dependent on the others." In this case, the four text messages in Specification 3 implicate the same criminal purpose and the same criminal law interest as the four text messages in Specification 4.

Additionally, the eight text messages alleged in Specifications 3 and 4 clearly unfolded in a single conversation. The appellant sent them in temporal proximity and as part of a cohesive, albeit lewd, exchange with A.C. In between the charged messages, A.C. replied and the appellant sent a few less colorful messages. Unlike emails sent mostly on separate days in *United States v. Cordle*, No. 200600570, 2007 CCA LEXIS 135, at *6, unpublished op. (N.M.Ct.Crim.App. 2007), the appellant's text messages represent "'a single staccato conversation.'" *Id.* (citation omitted)

Although they are not *distinctly* separate, each text message was a separate lewd communication from the appellant to A.C. The appellant typed each message, hit send, then waited for a reply before typing and sending the next message. This series of eight messages was a conscious and sustained repetition of the same criminal offense. But there is no substantive distinction among the texts, much less between the texts in Specifications 3 and 4. Thus, the second *Quiroz* factor supports the appellant.

Next we analyze Specifications 3 and 4 in light of the third factor of the *Quiroz* test: whether the number of charges and specifications misrepresents or exaggerates the appellant's criminality. Reasonableness must guide us in resolving the tension between charging a single course of conduct or breaking out the individual acts that comprise that course of conduct. *See* Quiroz, 55 M.J. at 338. In this case, the appellant was charged with sending 13 lewd text messages over three days and now objects to distribution of those messages over four specifications vice three. The Government could have consolidated all of the lewd text messages in a single specification or maintained a pattern of charging the lewd texts sent on a single day as a single specification. The decision to prefer and refer four specifications of the charge instead of three is puzzling but not unreasonable. The third *Quiroz* factor favors the Government.

The fourth *Quiroz* factor, whether the number of charges and specifications unreasonably increases the appellant's punitive exposure, is a different matter. Each violation of Article 120b without sexual contact exposes an accused to an additional 15 years of confinement. The appellant faced a maximum punishment of 61 years' confinement so the additional specification increased his potential confinement time more than 32%. Without a clearer justification, such a substantial escalation is unreasonable. This fourth *Quiroz* factor weights in the appellant's favor.

11

Finally, we must consider any evidence of prosecutorial overreach or abuse in the drafting of charges. In his brief, the appellant conceded there is no evidence of prosecutorial overreach or abuse in the drafting of charges.[15] Our review of the charge sheet as well as the voluminous exhibits of text messages in the record of trial presented no such evidence with regard to lewd communications. This final *Quiroz* factor falls in the Government's favor.

On balance, we decline to find unreasonable multiplication of charges in Specifications 3 and 4 of Additional Charge I. While our tally of factors is not dispositive, it reflects the narrow margin of our decision.

## Sentence Reassessment

Having set aside the Article 120c conviction, we must determine whether we are able to reassess the appellant's sentence. We consider the following non-exclusive list of factors:

(1) Whether there has been a dramatic change in the sentencing landscape;

(2) Whether the appellant was sentenced by members or military judge alone;

(3) Whether the remaining offenses capture the gravamen of criminal conduct and, relatedly, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses; and,

(4) Whether the remaining offenses are of the type with which we have sufficient experience and familiarity to reliably determine what sentence would have been imposed at trial.

*United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013); *see also, United States v. Moffeit*, 63 M.J. 40 (C.A.A.F. 2006); *United States v. Buber*, 62 M.J. 476 (C.A.A.F. 2006); and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

Without the conviction for violating Article 120c(c), the appellant's maximum sentence falls from 61 years' confinement to 60 years. This reduction does not dramatically change the sentencing landscape. Members sentenced the appellant to eight months' confinement, reduction to pay grade E-1, total forfeitures, and a bad-conduct discharge. The remaining convictions for sexual abuse of a child capture the gravamen of the appellant's criminal conduct. We have sufficient experience and familiarity with sexual abuse of child offenses to determine reliably what sentence would have been imposed at trial. We are confident that even without the dismissed charge; the appellant would have received the same sentence imposed at trial.

---

[15] Appellant's Brief of 26 Feb 2015 at 24 n. 70.

**Conclusion**

The findings of guilty to the Second Additional Charge II and its sole specification are set aside.  The remaining findings and the sentence are affirmed.

Chief Judge BRUBAKER and Judge HOLIFIELD concur.

For the Court



R.H. TROIDL
Clerk of Court