# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————

## No. 201700069

————————————

## UNITED STATES OF AMERICA
Appellee

v.

## TYSON M. BROWN
Aviation Machinist's Mate First Class (E-6), U.S. Navy
Appellant

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Robert J. Crow, JAGC, USN.
Convening Authority: Commander, Navy Region Southeast, Jacksonville, FL.
Staff Judge Advocate's Recommendation: Commander George W. Lucier, JAGC, USN.
For Appellant: Lieutenant Doug Ottenwess, JAGC, USN.
For Appellee: Lieutenant Clayton S. McCarl, JAGC, USN; Captain Brian L. Farrell, USMC.

————————————

Decided 21 June 2018

————————————

Before HUTCHISON, PRICE, and FULTON, *Appellate Military Judges*

————————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

————————————

HUTCHISON, Senior Judge:

A general court-martial composed of members with enlisted representation convicted the appellant, contrary to his pleas, of one specification of attempting to patronize a prostitute, one specification of rape, and one specification of aggravated assault in violation of Articles 80, 120, and 128, Uniform Code of

Military Justice (UCMJ), 10 U.S.C. §§ 880, 920, and 928 (2012).[1] The convening authority (CA) approved the adjudged sentence of a reprimand, eight years' confinement, total forfeiture of pay and allowances, reduction to pay grade E-1, and a dishonorable discharge. Except for the dishonorable discharge, the CA ordered the sentence executed.

The appellant alleges four assignments of error, three of which we address in detail.[2] First, he contends that his convictions for rape and aggravated assault are legally and factually insufficient. Next, the appellant argues that his conviction for aggravated assault represents an unreasonable multiplication of charges because the same act underlying the aggravated assault conviction was used to prove fear of death or grievous bodily injury under the rape specification. Finally, the appellant avers that the referral of charges evinces unlawful command influence since the State of Florida declined to prosecute based on the same evidence and the decision to refer the charges to court-martial was solely due to the perceived career ramifications of CAs who do not refer sexual assault allegations to court-martial.[3]

Having carefully considered the record of trial and the parties' submissions, we are convinced that the findings and the sentence are correct in law and fact and find no error materially prejudicial to the substantial rights of the appellant. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

On the night of 11 March 2015, the appellant went to a strip club where he consumed "three or four" mixed drinks.[4] After approximately two hours at the strip club, the appellant sent a text message to RH, whose advertisement he had seen on a known prostitution website. RH called the appellant and they arranged to meet in the early morning hours of 12 March 2015.

RH worked out of her home as a prostitute and admitted that she used the money she earned to fund her addiction to crack cocaine. RH testified that she

---

[1] The members acquitted the appellant of one specification of kidnapping, one specification of burglary, and three additional specifications of rape.

[2] In the fourth, summary assignment of error, the appellant argued the military judge erred in instructing the members regarding reasonable doubt. In accordance with our holding in *United States v. Rendon,* 75 M.J. 908, 915-17 (N-M. Ct. Crim. App. 2016), *rev. denied*, 76 M.J. 128 (C.A.A.F. 2017), we summarily reject the summary assignment of error. *United States v. Clifton*, 35 M.J. 79, 81-82 (C.M.A. 1992).

[3] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] Record at 789.

had smoked "two rocks of crack cocaine"[5] before meeting the appellant, but that the effects of the drug had worn off by the time they met.

At the request of RH, the appellant arrived at RH's home with a 12-pack of beer and cigarettes. RH drank one of the beers and the appellant drank a caffeinated, flavored alcoholic beverage while the two became acquainted. After about 20 minutes at RH's house, the appellant suggested they go to his house because it would be more comfortable. Although RH admitted that she did not like the idea of going to the appellant's home because she could lose out on other clients if she was not at home, she nevertheless agreed. At trial, both the appellant and RH testified, but provided different accounts of what transpired after they left RH's house.

### 1. RH's testimony

According to RH, on the drive to the appellant's house she noticed a handgun beneath the driver's seat. RH told the appellant she was "scared of . . . people with guns" and asked him why he had one.[6] The appellant responded that he was in the Navy and showed her "his badge," which was hanging from a lanyard on the rearview mirror.[7] Once they arrived at the appellant's house, RH continued to drink the beer that the appellant had purchased and the appellant drank a mixed drink he had made for himself. Eventually the appellant "started getting a little aggressive and pull[ed] out his penis" and began "touching" RH.[8] RH testified that at this point, she asked the appellant about money. The appellant went into his bedroom and returned with 52 one-dollar bills. RH told the appellant that $52 was not enough and asked the appellant to take her home.[9] RH also testified that she was not feeling comfortable in the appellant's home; besides the appellant not having enough money for her services, RH stated she had already "wasted . . . an hour-and-a-half with [the appellant] and . . . he was getting a little aggressive and he was getting . . . drunker."[10] RH expressed her frustrations in a Facebook post she made while at the appellant's house: "I hate chilling with drunk ass

---

[5] *Id.* at 425.

[6] *Id.* at 367.

[7] *Id.* RH used the term "badge" to described the appellant's military Common Access Card.

[8] *Id.* at 371.

[9] RH testified that she discussed her price with the appellant both on the phone prior to meeting him and at her house. The appellant told her that he "had $80 or $90 on him" and RH agreed that was enough. *Id.* at 359.

[10] *Id.* at 372.

Navy men, then I can't get drunk, cause they do too much, uh, I'm going home."[11]

The appellant offered to pay more but indicated to her that they would need to stop by an ATM. However, RH refused and told the appellant she wanted to go home. On the drive back to RH's house, the appellant pulled into the parking lot of a strip club where, according to RH, the appellant pulled out his gun, held it to her head, and demanded oral sex. Fearing she would be shot, RH complied.[12] After a few minutes, the owner of the strip club came out with a flashlight and demanded they leave. After leaving the parking lot, the appellant told RH that she was going to finish what she started and handed her the one-dollar bills. RH tried to deescalate the situation and make the appellant "feel comfortable."[13]  When they arrived at RH's house, she told the appellant that she "would finish whatever [the appellant] wanted [her] to finish" but asked him not to bring the gun in with him.[14] The appellant agreed and said he was going to leave the gun in the car—but unbeknownst to RH, he did not.

Once back inside the house, RH and the appellant sat down on her living room couch and continued drinking. After a few minutes of escalating sexual behavior, RH invited the appellant to her bedroom. RH thought that if she did what the appellant wanted, he would eventually leave. Once back in the bedroom, RH and the appellant engaged in oral and vaginal intercourse.[15] The appellant then asked RH to have anal sex, but she declined. The appellant became angry, pulled out his gun and hit RH on the left side of the face and ribs, telling her, "[Y]ou're going to do what I told you to do or I'm going to shoot you."[16] RH described being "scared to death."[17] After permitting RH to get some petroleum jelly for lubricant, the appellant removed the condom he was wearing and had anal sex with RH.

After completing his sex act with RH, the appellant demanded his money back. RH told the appellant that his money was in the living room beneath a cushion on her love seat. The appellant then forced RH into the living room at gunpoint and began searching for the money. While the appellant was

---

[11] *Id.* at 384; Prosecution Exhibit (PE) 9.

[12] The appellant was acquitted of this rape allegation.

[13] Record at 392.

[14] *Id.* at 393.

[15] The appellant was acquitted of both rape specifications resulting from the oral and vaginal intercourse.

[16] Record at 399.

[17] *Id.* at 401.

preoccupied searching for the money, RH managed to unlock her front door and ran naked out of her home.

RH initially ran and hid behind a large tree. She then heard the appellant yell, "Bitch you think I'm playing," followed by a gunshot.[18] She then ran and hid beneath a parked pickup truck until she saw one of her neighbors open his door to let his dog out. RH ran for the open door and entered a residence occupied by DB and OM. She quickly explained what was happening, asked to use DB's phone, and called 911.

*2. The appellant's testimony*

After the appellant and RH arrived at his house, RH continued drinking the beer the appellant had purchased and the appellant made himself a mixed drink. Aside from noting that he and RH listened to music and continued drinking, the appellant did not provide any additional details regarding the time they spent together at his house. But, the appellant did testify that he never gave RH any money at his house because "then she can decide not to do nothing and I'm out of money."[19] The appellant explained that after nearly two hours at his house, "[i]t was getting late and we both decided it was time to go."[20]

According to the appellant, during the car ride back to RH's house, RH told him that she wanted to make some money, unzipped the appellant's pants and began performing oral sex on him while he was driving. Unable to continue driving, the appellant pulled over into the first parking lot he could find, which happened to be a strip club.[21] A few minutes later, the owner of the strip club approached the vehicle, shining a light. The appellant, fearful it was the police, quickly pulled up his pants while RH "jumped off of [him.]"[22] The appellant rolled down the passenger-side window—closest to RH—saw that the individual coming towards them was not the police, and drove away after being told he was on private property.

Once back at RH's house, the appellant took his wallet, phone, keys, and gun inside with him and "tucked them underneath" the side of the couch.[23] The appellant and RH then kissed before going back into RH's bedroom, where they had vaginal and anal intercourse. The appellant admitted that he took off his

---

[18] *Id.* at 412.

[19] *Id.* at 797.

[20] *Id.* at 798.

[21] This strip club is different than the one patronized earlier by the appellant.

[22] Record at 799.

[23] *Id.* at 800.

condom and, at one point, RH left the bedroom and returned with petroleum jelly. The appellant denied ever striking RH with his gun or threatening her in any way. After they finished having sex, the appellant testified that he got dressed, but RH remained naked, and they went back into the living room so he could retrieve his belongings. Although he found his gun where he had left it, the appellant could not find his keys, wallet or phone. After searching both the living room and bedroom, raising seat cushions, and looking underneath furniture—"I went through everything"—the appellant still could not find his remaining items.[24] The appellant asked RH where his keys were, but RH said she did not have them. Soon after, RH "took off like a bull out the door."[25] The appellant "bolted after her" and fired his gun into the air, yelling "Bitch where my keys at?"[26]

Sheriff's deputies responded to RH's 911 call and found the appellant hiding beneath an empty trailer-home located near RH's house. A short time later, they found the appellant's handgun nearby. The appellant's wallet and phone were inside the appellant's car, but his keys were never found. During a lengthy police interrogation, the appellant initially told detectives that he met RH at the strip club and that they never had sex. At trial, the appellant admitted that he lied repeatedly during his interrogation—"almost 40 times"— because he had a 3-year-old daughter and a military career and he had "just patronized a prostitute and fired a gun in the air."[27]

Additional facts necessary to resolution of the assignments of error are included below.

## II. DISCUSSION

## A. Factual and legal sufficiency

The members found the appellant guilty, by exceptions and substitutions, of raping RH—penetrating her anus with his penis by placing her in fear that she would be subjected to death or grievous bodily harm, to wit: "by striking her head with a dangerous weapon, to wit: a loaded firearm."[28] The members also found the appellant guilty, by exceptions, of aggravated assault for

---

[24] *Id.* at 804.

[25] *Id.* at 805

[26] *Id.* at 805, 806.

[27] *Id.* at 807-08.

[28] *Id.* at 945. The appellant was originally charged with rape of RH, "to wit: penetration of her anus with his penis, by placing her in fear that she would be subjected to death or grievous bodily harm, to wit: holding a loaded firearm to her head." Charge Sheet.

striking RH on the head with a dangerous weapon, "to wit: a loaded firearm."[29] The appellant argues that his convictions for rape and aggravated assault are legally and factually insufficient because RH was an "incredible witness," whose account of the night is uncorroborated, and cannot be trusted because it is "clouded by her crack cocaine use."[30] We disagree.

We review questions of legal and factual sufficiency *de novo. United States v. Turner,* 25 M.J. 324, 324 (C.M.A. 1987). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *Turner*, 25 M.J. at 324). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325; Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The appellant points to several perceived problems with RH's version of events. First, RH admitted to using crack cocaine in the hours leading up to encounter with the appellant. Second, RH suffered from bipolar disorder and admitted that she was not taking her prescribed antidepressant and mood-stabilizing medications. Third, the appellant points to the testimony of OM, one of RH's neighbors who lived in the house she entered when fleeing the appellant. OM testified that RH was "paranoid and skittish" and that she told

---

[29] Record at 945. The members excepted the words "and ribs" from the specification. Charge Sheet.

[30] Appellant's Brief of 29 Sep 2017 at 14.

OM that her intent was "to get [the appellant] back to her crib and pretty much get as much money as she could from him to get high."[31]

The appellant also noted other discrepancies in the government's theory of the case. RH testified she saw the appellant's "badge" on a lanyard hanging from the rearview mirror, yet the appellant's military Common Access Card was found in his wallet and crime scene photos show no lanyard hanging from the rearview mirror. The owner of the strip club where the appellant and RH parked on their way back to RH's house testified that the occupants of the car were "laughing" and "giggling" and the passenger did not appear to be in distress.[32] RH testified that after fleeing her house naked, she hid underneath a truck, but she showed no signs of dirt, bruising, scratches or cuts despite the ground beneath the truck being covered in dirt and pine needles. Finally, the appellant's forensic consultant testified that photographs he reviewed of the victim did not reveal any "pattern injury" on RH's head consistent with being struck by a hand gun.[33] Based on all of these discrepancies, the appellant contends that we cannot rely on RH's testimony and cannot be convinced beyond a reasonable doubt of his guilt.

Despite the appellant's assertions, however, RH's version of her encounter with the appellant is corroborated. RH's neighbor, DB, testified that he heard a gunshot, and then less than five minutes later, RH ran into his home "[n]aked, distraught, looking upset, definitely scared."[34] RH used DB's cell phone to call 911. The recorded 911 call captured RH's fear as she described in hushed tones how the appellant "came in and raped [her] . . . hit [her] upside the head with a gun . . . he was going to shoot [her] in the head."[35] A detective responding to the scene testified that he observed swelling to RH's "eyebrow area . . . and she also had slight swelling to the cheek[.]"[36] A Sexual Assault

---

[31] Record at 734, 735. OM admitted during cross-examination that he was "a two-time convicted felon", had spent the night of the incident playing video games, and had smoked marijuana "just a few hours before [he] saw [RH.]" *Id.* at 736.

[32] *Id.* at 719.

[33] *Id.* at 764.

[34] *Id.* at 465. DB and OM were roommates, although DB testified that he did not know OM's "actual real name"—referring to him instead by a nickname—and explained that OM and he "used to party together and [OM] needed a place to stay so I let him crash." *Id.* at 463.

[35] PE 3; Appellate Exhibit (AE) LXII at 1.

[36] Record at 540; *see also* PE 1 at II, JJ, KK, LL.

Nurse Examiner testified that she observed swelling on RH's scalp near the hairline.

Importantly, the appellant admitted that he lied almost 40 times when initially questioned by the police. Although the appellant contends that he did so because he was worried about his career and his daughter after he had been caught patronizing a prostitute and discharging his firearm, his later admissions reveal a different concern. After finally admitting that he had vaginal intercourse with a prostitute, the appellant continued to deny that he had anal sex:

> [Appellant]: No anal sex.
>
> [Jacksonville Sheriff's Office (JSO)]: No anal sex.
>
> [Appellant]: There couldn't have been anal sex.
>
> JSO: Why is that?
>
> [Appellant]: I don't remember that.
>
> JSO: What do you mean it couldn't have been?
>
> [Appellant]: I don't think we had no—we didn't have no anal— couldn't have been no anal sex. You'd know if you have anal sex.[37]

Once the appellant confessed to soliciting a prostitute and to engaging in vaginal intercourse with her, his purported reason for lying to the police was extinguished, leaving no explanation for his continued denials of engaging in anal sex with RH if she was a willing participant. Rather, we find his denial of engaging in anal sex with RH evidence of consciousness of guilt.

RH's testimony was persuasive, and her actions—running naked from her home and calling 911—as well as the injuries observed are consistent with being raped and assaulted by the appellant. Although the appellant identified inconsistencies in RH's story, we are mindful that proof beyond a reasonable doubt does not mean that the evidence must be free from conflict. *Rankin*, 63 M.J. at 557. Indeed, the members acquitted the appellant of several specifications where RH's testimony was contradicted or called into question by other evidence. Regardless, we "may believe one part of a witness' testimony and disbelieve another." *United States v. Diaz*, 61 M.J. 594, 599 (N-M. Ct. Crim. App. 2005) (citing *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979)). Finally, we are not persuaded by the appellant's self-serving testimony, wherein he portrays himself as a potential victim of larceny.

After carefully reviewing the record of trial and considering all of the evidence in a light most favorable to the prosecution, we are convinced that a

---

[37] PE 5; AE LVII at 34.

reasonable factfinder could have found the appellant raped RH and assaulted her with a means or force likely to cause death or grievous bodily harm. Furthermore, weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we too are convinced beyond a reasonable doubt of the appellant's guilt.

## B. Unreasonable multiplication of charges

The appellant contends that his conviction for aggravated assault represents an unreasonable multiplication of charges since the underlying act constituting the means or force likely to produce death or grievous bodily harm—"striking [RH] on the head with a dangerous weapon, to wit: a loaded firearm"—was the same act that made RH fear death or grievous bodily harm under the rape specification.

"What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." RULE FOR COURTS-MARTIAL (R.C.M.) 307(c)(4), MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.). Unreasonable multiplication of charges is a concept distinct from multiplicity. *United States v. Quiroz*, 55 M.J. 334, 337 (C.A.A.F. 2001). It "addresses those features of military law that increase the potential for overreaching in the exercise of prosecutorial discretion." *Id.* The appellant did not raise this issue at trial and, therefore, forfeits this issue on appeal. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). "Although forfeiture of an allegation of error normally requires the appellant to show plain error, the widely used *Quiroz* test for unreasonable multiplication of charges incorporates forfeiture of the issue." *United States v. Johnston*, 75 M.J. 563, 571 (N-M. Ct. Crim. App. 2016) (citing *Gladue*, 67 M.J. at 313); *cf. Quiroz*, 55 M.J. at 338.

Applying *Quiroz*, we consider five non-exclusive factors to determine whether there is an unreasonable multiplication of charges:

(1) Whether the appellant objected at trial;

(2) Whether each charge and specification is aimed at distinctly separate criminal acts;

(3) Whether the number of charges and specifications misrepresents or exaggerates the appellant's criminality;

(4) Whether the number of charges and specifications unreasonably increases the appellant's punitive exposure; and,

(5) Whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charges.

*See Quiroz*, 55 M.J. at 338-39. No one factor is dispositive. Instead, these factors are weighed together, and "one or more . . . may be sufficiently

compelling[.]" *United States v. Campbell,* 71 M.J. 19, 23 (C.A.A.F. 2012). We now examine each of the factors.

*1. Whether the appellant objected at trial*

This factor favors the government as the appellant did not object at trial.

*2. Whether the rape specification and aggravated assault specification are aimed at distinctly separate criminal acts*

First, aggravated assault as charged here is not a lesser included offense of the rape specification as excepted and substituted by the members. *United States v. Riggins,* 75 M.J. 78, 84-85 (C.A.A.F. 2016) (the "distinction between physical contact (for assault consummated by a battery) and a mental state of fear . . . (for sexual assault and abusive sexual contact) further demonstrates that assault consummated by a battery contains an element that is not included in the sexual assault and abusive sexual contact offenses charged here") (citations omitted). The appellant's aggravated assault conviction required that the weapon be used in a manner "likely to produce death or grievous bodily harm."[38] Conversely, the appellant's rape conviction had no such requirement; rather the government needed only to prove that RH feared that she would be subjected to death or grievous bodily harm—not that the weapon *was used* in a manner likely to produce death or grievous bodily harm when he struck her with it.

Second, despite the appellant's assertion that the aggravated assault and rape specifications "were the exact same transaction," the testimony of RH reveals that, in fact, each was a separate and distinct act, separated by some short period of time.[39] RH testified that the appellant hit her on the side of the head after he asked for anal sex and she declined.[40] After the appellant attempted to penetrate her, RH asked if she could get some lubricant. The appellant relented and RH left the bedroom and returned with petroleum jelly. RH testified she then applied the petroleum jelly and the appellant had anal sex with her. RH testified that she was "scared" and had "no choice."[41] As a result, the appellant raped RH by placing her in fear—a fear produced by previously pistol whipping her with a loaded gun—that she would be subjected to death or future grievous bodily harm. Therefore, we conclude the second *Quiroz* factor favors the government.

---

[38] MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 54.b.(4)(a)(iv),

[39] Appellant's Brief at 25.

[40] Record at 398.

[41] *Id.* at 400.

*3. Whether the number of charges and specifications misrepresents or exaggerates the appellant's criminality*

This factor, too, favors the government. As noted above, the rape and aggravated assault charges represent different aspects of the appellant's behavior. The appellant's rape conviction represents the criminality involved in committing a sexual act on RH by placing her in fear for her life, while his aggravated assault conviction represents the criminal aspect of using, in a manner likely to produce death or grievous bodily harm, his loaded gun as a bludgeon.

*4. Whether the number of charges and specifications unreasonably increases the appellant's punitive exposure*

Because the appellant's rape charge carried a maximum punishment of confinement for life without the eligibility for parole, the aggravated assault specification did not increase the appellant's punitive exposure. *United States v. Anderson*, 68 M.J. 378, 386 (C.A.A.F. 2010). This factor also favors the government.

*5. Whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charges*

Finally, there is no evidence of prosecutorial overreaching since the rape specification as originally charged did not include language similar to that charged in the aggravated assault specification.[42] Rather, the members found the appellant guilty through exceptions and substitutions. As a result, we conclude this factor, too, favors the government.

Finding all the *Quiroz* factors weigh in favor of the government, we conclude that the charges were not unreasonably multiplied.

## C. Unlawful command influence

The appellant contends that after the State of Florida decided not to prosecute the appellant for sexual offenses because of a lack of evidence, the CA referred the charges and specifications against the appellant to court-martial because she was under pressure to prosecute sexual assault cases. The appellant cites a report from a subcommittee of the congressionally-mandated Judicial Proceedings Panel as evidence that CAs feel pressure to refer cases to courts-martial because of public and congressional interest.[43]

---

[42] *See* Charge Sheet. The referred rape specification alleged that the appellant place RH in fear by "holding a loaded firearm to her head."

[43] *See* Appellant's Brief at Appendix 1.

We review allegations of unlawful command influence (UCI) *de novo. United States v. Harvey*, 64 M.J. 13, 17 (C.A.A.F. 2006).[44] UCI may be actual, resulting in real prejudice to an accused, or apparent, with no discernible effect on an accused but resulting in a loss of confidence in the fairness of our military justice system.

An accused has the burden of raising a claim of UCI and must "(1) show facts which, if true, constitute [UCI]; (2) show that the proceedings were unfair; and (3) show that [UCI] was the cause of the unfairness." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citing *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994)). However, the appellant's showing must be "more than mere allegation or speculation." *Id.* at 150 (citation omitted). If the appellant meets this burden, the burden shifts to the government to rebut "by persuading the appellate court [beyond a reasonable doubt] that the [UCI] had no prejudicial impact on the court-martial." *Id.* at 151.

Alternatively, an appellant may raise a claim of apparent UCI by showing "some evidence" of "facts, which if true, constitute [UCI]" and that "this [UCI] placed an intolerable strain on the public's perception of the military justice system because an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (citations and internal quotation marks omitted). If an appellant presents some evidence, the burden shifts to the government to rebut the allegations beyond a reasonable doubt by proving the proffered facts do not exist, that they do not constitute UCI, or that they do not place an intolerable strain on public perception of the fairness of the proceeding. *Id.*

Here, the appellant has failed to meet his threshold requirement for either actual or apparent UCI. The appellant merely speculates that the CA referred charges to court-martial because of external pressures. Yet, the record before us reveals that both the Article 32, UCMJ, preliminary hearing officer (PHO) and the staff judge advocate (SJA), recommended to the CA that she refer the appellant's case to general court-martial. A CA "merely applies a reasonable grounds standard in determining whether to refer charges to a general court-martial[.]" *Id.* at 250 (citing R.C.M. 601(d)(1)). Armed with both the PHO's report and her SJA's recommendation, the CA had reasonable grounds to refer the charges and the appellant has provided no evidence that the CA, instead,

---

[44] Although the appellant first raises UCI on appeal, UCI is never waived. *See United States v. Baldwin,* 54 M.J. 308, 310 n.2 (C.A.A.F. 2001) ("We reject the Government's claim of waiver. We have never held that an issue of unlawful command influence arising during trial may be waived by a failure to object or call the matter to the trial judge's attention.").

only referred the charges to general court-martial because of some external pressure. Consequently, the appellant's claim of UCI fails.

### III. CONCLUSION

The findings and sentence are affirmed. The supplemental court-martial order shall reflect that the appellant is entitled to 239 days' confinement credit. *United States v. Crumpley,* 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).

Judge PRICE and Judge FULTON concur.

For the Court



R.H. TROIDL
Clerk of Court