*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
CRISFIELD, HITESMAN, and J. STEPHENS
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Cheveaux DAWKINS**
Lieutenant Commander (O-4), MC, U.S. Navy
Appellant

**No. 201800057**

Decided: 30 September 2019

Appeal from the United States Navy-Marine Corps Trial Judiciary upon reconsideration. Military Judge: Captain Arthur L. Gaston III, JAGC, USN. Sentence adjudged 15 September 2017 by a general court-martial convened at Naval Support Activity, Naples, Italy, consisting of officer members. Sentenced approved by the convening authority: dismissal.

For Appellant: David P. Sheldon, Esq.; Tami L. Mitchell, Esq.; Captain Thomas R. Fricton, USMC.

For Appellee: Major Kelli A. O'Neil, USMC; Lieutenant Kimberly Rios, JAGC, USN.

Senior Judge HITESMAN delivered the opinion of the Court, in which Judge J. STEPHENS joined. Chief Judge CRISFIELD filed a separate opinion dissenting in part.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 30.2.**

_____

HITESMAN, Senior Judge:

We originally released our decision in this case on 5 September 2019. In accordance with Navy-Marine Corps Court of Criminal Appeals Rule of Appellate Procedure 31(a), we withdrew that opinion and we replace it now to clarify the limited circumstance in which the convening authority may consider the accused's race or gender when selecting the venire.

Appellant was convicted, contrary to his pleas, of attempted sexual assault, two specifications of abusive sexual contact by bodily harm,[1] and indecent exposure in violation of Articles 80, 120, and 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920 & 920c (2016).

The appellant raises 12 assignments of error (AOE). Six AOEs were fully briefed, one supplemental AOE was allowed by the court[2] and was fully briefed, and five additional AOEs were identified but lack full briefing.[3] Having examined the record of trial and the pleadings of the parties, we conclude that AOEs VII–XI are meritless and warrant neither further discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). The remaining AOEs are:

(I) The improper exclusion of women and African-Americans from the panel deprived appellant of a fair trial;

(II) The evidence is legally and factually insufficient to sustain appellant's convictions;

(III) The military judge erred when he prevented a member's question from being asked;

(IV) The trial defense counsel was ineffective for concurring that a member's question should not be asked, for failing to advise appellant that he could testify and limit the subject matter, for failing to object to text messages between the appellant and Ms. KL, and for failing to provide additional argument

---

[1] The military judge conditionally dismissed Specification 2 of Charge II, upon successful appellate review of Charge I, as an unreasonable multiplication of charges. Record at 916.

[2] On 23 April 2019, the Court granted the appellant leave to file a supplemental assignment of error.

[3] AOEs VII through XI were filed pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

after stipulating to the admission of text messages between appellant and Ms. KL;

(V) The appellant's sentence to dismissal is inappropriately severe;

(VI) A mandatory minimum sentence of dismissal is unconstitutional as a violation of the Eighth and Fifth Amendments to the United States Constitution; and

(XII) The military judge erred by not instructing the members that in order to convict the appellant of the sexual assault offenses related to Ms. KL, they had to find that the appellant knew Ms. KL did not consent to the sexual act and contact.

We find merit in AOE II rendering part of AOE IV and AOEs V, VI, and XII moot. In our decretal paragraph, we dismiss the Specification of Charge I and Specifications 2 and 4 of Charge II with prejudice. Finding that we are unable to reassess the sentence for the remaining offense, we remand the case for a rehearing on sentence.

## I. BACKGROUND

The appellant and Ms. KL were friends and met at a bar in Rota, Spain on 26 March 2016. Ms. KL, a civilian employee of the U.S. Naval Hospital in Rota, was having dinner and drinks with friends. She contacted the appellant by text message and let him know she was in the area. The appellant found Ms. KL and her friends at a bar and they began talking. Ms. KL and the appellant were still talking when Ms. KL's friends moved on to another bar.

When Ms. KL and the appellant decided to follow the group, they walked down a nearby alley towards the beach. As the appellant walked with Ms. KL, they spoke briefly to a Sailor from the Naval Hospital, Hospital Corpsman Second Class (HM2) Collins. Ms. KL and the appellant continued walking and then stopped in a doorway to sit and talk. They began making out and Ms. KL's pantyhose ended up at her knees. Ms. KL was wearing a miniskirt and the appellant put his hand between her legs, pushed her underwear to the side, and touched her vagina with his fingers. Ms. KL stood up and took her pantyhose completely off and put them in her purse. They continued walking and stopped at the beach where the appellant began kissing Ms. KL while holding her from behind. Ms. KL could feel the appellant's penis against her genitals through her underwear. Ms. KL asked the appellant "not to do it"[4] and they stopped. Ms. KL assumed that the appellant stopped because he could not get

---

[4] Record (R.) at 515.

an erection. As the appellant walked Ms. KL to a taxi stand, HM2 Collins noticed them again. The appellant and Ms. KL rode together in a taxi to the place where Ms. KL had left her car and they parted ways. At 0323 in the morning, the appellant texted Ms. KL and asked whether she made it home safely. Ms. KL responded that she had and "thanks."[5]

The following weekend, the appellant attended a unit dining-in at the Hotel Duque de Najera where there was much drinking and revelry. While certain members of the mess started to change out of their uniforms and into various themed costumes, Lieutenant (Junior Grade) (LTJG) EA started to feel sick. The appellant helped her to the ladies' room, which consists of a small room with three sinks and two interior small bathrooms that provide complete privacy. The appellant assisted LTJG EA into a bathroom where she vomited twice. Lieutenant (LT) KC, a subordinate of the appellant, entered the ladies' room and then entered one of the bathrooms and changed into her costume. She then briefly spoke with the appellant and left to check on another sick officer. LT KC alleges that when she returned to the ladies' room, the appellant grabbed her breast with one hand and grabbed her hand with his other hand and put it on his buttock. LT KC then assisted LTJG EA for some time before returning to her friends in the main event room.

The appellant was reassigned within the hospital after LT KC reported the incident a few days later. The appellant's new office was located in the same passageway as Ms. KL's office. Shortly thereafter, Ms. KL reported that the appellant had sexually assaulted her in the doorway and on the beach.

Additional facts necessary to resolve the AOEs raised are discussed below.

## II. DISCUSSION

### A. Improper Exclusion of Members

The appellant is an African-American male. For the first time on appeal, he alleges that he was deprived of a fair trial because the court members detailed to sit at his court-martial were improperly selected in violation of Article 25, UCMJ, due to the systematic exclusion of African-Americans and women.

RULE FOR COURTS-MARTIAL (RCM) 912(b)(1), MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.), provides that, when evidence is discovered that court members may have been selected improperly, a party may move to stay the proceedings. RCM 912(b)(2) authorizes the military judge to

---

[5] Defense Exhibit B.

stay the proceedings until the court members have been properly selected. Failure to make a timely motion waives the improper selection, unless the improper selection violates RCM 501(a), 502(a)(1), or 503(a)(2). At trial, the defense had the same information relied upon by the appellant today and yet did not request a stay under RCM 912(b)(1). However, the Court of Appeals for the Armed Forces (CAAF) finds no waiver where the "objection is based on an allegation that the convening authority selected members for reasons other than those listed in Art. 25, UCMJ." *United States v. Riesbeck*, 77 M.J. 154, 160 (C.A.A.F. 2018).

Even if waiver does not apply, we find that the appellant failed to carry the burden of establishing improper exclusion and selection of members. We review de novo, as a question of law, whether a court-martial panel was selected by improper exclusion. *United States v. Kirkland*, 53 M.J. 22, 24 (C.A.A.F. 2000). The appellant must first establish that qualified personnel were improperly excluded from his panel. *Id.* If the appellant can show exclusion, "the government must show by competent evidence that the member selection process was free from impropriety." *United States v. Bartee*, 76 M.J. 141, 143 (C.A.A.F. 2017).

We first look at the authority of the convening authority. Article 25(d)(2), UCMJ provides:

> [T]he convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament.

The convening authority must apply the criteria of Article 25, UCMJ, in order to pick those "best qualified" to be members. *See United States v. Dowty*, 60 M.J. 163, 169 (C.A.A.F. 2004). The appellant is not entitled to a panel that represents a cross-section of the eligible military population. *United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1984). Gender and race are not listed in Article 25, UCMJ, and are generally improper factors for consideration except "in one limited circumstance: when seeking in good faith to make the panel more representative of the accused's race or gender." *United States v. Riesbeck*, 77 M.J. 154, 163 (C.A.A.F. 2018). While a trial counsel's use of a peremptory challenge against a panel member from the accused's same cognizable racial group establishes a prima facie case of purposeful discrimination under *Batson v. Kentucky,* 476 U.S. 79 (1986), the absence of such members in the venire selected by the convening authority does not. *United States v. Jeter*, 78 M.J. 754, 765-66 (N.M. Ct. Crim. App. 2019), *petition granted*, __ M.J. __, No. 19-0198/NA, 2019 CAAF LEXIS 690 (C.A.A.F. Sept. 19, 2019).

First, the appellant presents no evidence that women were excluded other than the fact that none eventually sat as members of his court-martial. The

convening authority detailed a female officer but, without objection from trial defense counsel when specifically asked by the military judge, the government used a preemptory challenge against her and she was excused.[6] The appellant presents no other evidence of exclusion, much less improper exclusion, and therefore fails to establish that all other women were also excluded because of their gender.

Second, although the exclusion of individuals because of race is improper, *United States v. Santiago-Davila*, 26 M.J. 380, 390 (C.M.A. 1988), we find that the appellant failed to establish that African-Americans were excluded from his panel. The record before us contains no information on the race of those members detailed to the court-martial nor of those ultimately empaneled as members. The court-martial questionnaires do not contain any information on race[7] and no member was questioned on the record with regard to their race. However, accepting the appellant's assertion that no African-Americans were actually detailed or empaneled, the appellant still fails to produce any evidence of systemic exclusion. "A prima facie case of systemic exclusion is not established by the absence of minorities on a single panel." *Loving*, 41 M.J. at 285.

In this case, the appellant has not identified any evidence that the convening authority improperly excluded qualified personnel from the selection process. Instead, he makes a broad assertion that because no African-Americans and only one female were detailed to his court-martial, the convening authority must have improperly excluded those groups of people from consideration for detailing.

---

[6] When the government raised its peremptory challenge, the military judge specifically asked the defense if they had any objections:

MJ:    Does the Government have a peremptory challenge?

ATC:    Yes, Your Honor, Commander [C].

MJ:    All right. Defense, do you want to raise any issue with respect to Commander [C]?

DC:    No, sir.

MJ:    No *Batson* challenge?

    All right. Negative Response from defense counsel. Commander [C] is excused.

R. at 210-11.

[7] AE XXXIV.

The appellant alleges that the exclusion of certain members also constitutes unlawful command influence. "Court stacking" is a form of unlawful command influence that may occur by the improper exclusion of members based on race or gender. *Loving*, 41 M.J. at 286-7. To substantiate such a claim, the defense has the burden of producing sufficient evidence of unlawful command influence. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). The quantum of evidence is low but must be more than a bare allegation or mere speculation. *Id.* We find that the appellant did not raise the issue at trial, and does not raise any evidence here to suggest that the convening authority departed from the bounds of Article 25, UCMJ, through a systematic exclusion of African-Americans or women from participation in appellant's court-martial.

In the absence of any such evidence, we will not assume that the convening authority in this case improperly excluded qualified personnel, including African-Americans and women, from the selection process. Likewise, the appellant has failed to raise sufficient evidence of unlawful command influence. Accordingly, we find this assignment of error is without merit.

## B. Legal and Factual Sufficiency of the Conviction

The appellant contends that the evidence is legally and factually insufficient to support any of the appellant's convictions. We review questions of legal and factual sufficiency de novo. Article 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). To determine legal sufficiency, we ask whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015). In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. However, proof beyond a reasonable doubt does not mean the evidence must be free from conflict. *United States v. Norwood*, __ M.J. __, No. 201800038 2019 CCA LEXIS 318, *25 (N-M. Ct. Crim. App. Aug. 9, 2019) (citing *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006)).

*1. Offenses involving Ms. KL*

a. Attempted sexual assault

The appellant was convicted of the attempted sexual assault of Ms. KL. To support this conviction, the government was required to prove beyond a reasonable doubt that: (1) the appellant did a certain act—touching Ms. KL's genitals, directly or through clothing, with his penis; (2) the act was done with the specific intent to commit the offense of sexual assault, to wit: penetrating Ms. KL's vulva with his penis, by causing bodily harm to her, to wit: touching her genitals with his penis; (3) the act amounted to more than mere preparation, that it was a substantial step and a direct movement toward the commission of the intended offense; and (4) such act apparently intended to bring about the commission of the offense of sexual assault, and the act apparently would have resulted in the actual commission of the attempted offense. MCM, Part IV, ¶ 4.b.

The elements of the intended offense of sexual assault are that: (1) the appellant committed a sexual act upon Ms. KL, to wit: penetrating her vulva with his penis; (2) the appellant did so by causing bodily harm to Ms. KL, to wit: penetrating her vulva with his penis, MCM, Part IV, ¶ 45.b.(3)(b); and (3) the appellant did so without Ms. KL's consent. Military Judge's Benchbook (Benchbook), Dep't of the Army Pamphlet 27-9 at ¶ 3-45-14, note 2 (1 Sep 2014).

The appellant was also convicted of abusive sexual contact of Ms. KL, which also served as the act alleged in the specification of attempted sexual assault. To support this conviction, the government needed to prove beyond a reasonable doubt that: (1) the appellant committed sexual contact upon Ms. KL, by touching, directly or through clothing, her genitals with his penis; (2) the appellant did so by causing bodily harm to Ms. KL, to wit: touching, directly or through clothing, her genitals with his penis; (3) the appellant did so with the intent to arouse or gratify his sexual desire, MCM, Part IV, ¶ 45.b.(7)(b); and (4) the appellant did so without the consent of Ms. KL. The military judge added the fourth element as recommended by the Military Judge's Benchbook when "the same physical act is alleged as both the actus reus and the bodily harm for the charged sexual contact." Benchbook at ¶ 3-45-16, note 2.

Ms. KL testified that once they reached the beach, the appellant may have put one of his arms around her from behind while he held his penis with the other hand. She did not see the appellant do this, and was unsure if it was happening, but assumed that it was because of her experience with how men

8

maneuver "when they come from behind."[8] She stated that she felt the appellant's penis touch her vagina through her underwear although she did not testify that her miniskirt was moved or otherwise manipulated to allow the appellant access to her genitalia. She testified that she let the appellant kiss her on the cheek as he was standing behind her.[9] She stated that she felt the appellant's penis touch her genitals through her thong underwear. When the trial counsel asked Ms. KL what was going through her mind at this point, she stated, "In my mind I'm just like—the only thing I remember saying [is] that I don't want to do this. Don't do this. In my mind at that point I'm just like just get this over with so I can leave."[10] Ms. KL then testified that she asked the appellant "not to do it"[11] but did not try to physically stop him. Ms. KL assumed that the appellant stopped because he could not get an erection but denied ever talking to the appellant about this. Finally, Ms. KL testified that when the appellant could not get an erection, he stood beside her and masturbated.[12]

The military judge instructed the members regarding the mistake of fact as to consent defense. We are persuaded that the appellant did in fact have an honest and reasonable belief that Ms. KL was consenting to the sexual touching up until the point when she asked him "not to do it."

The appellant and Ms. KL were making out in a doorway just minutes before they arrived at the beach. During that sexual encounter, Ms. KL and the appellant were kissing and the appellant touched Ms. KL's vulva with his fingers after partially removing Ms. KL's pantyhose. Ms. KL eventually stood up and completely removed her pantyhose and placed them in her purse. Ms. KL and the appellant then began walking towards the beach. Ms. KL testified that the appellant was standing behind her, kissing her cheek and neck, and presumably holding his penis as he touched her genitals with his penis. Ms. KL conceded on cross-examination that she let the appellant kiss her as he was standing behind her.[13] Since she actually consented to the kissing, it is reasonable to believe that the other contemporaneous sexual touching was at least perceived as consensual up until the point when she asked the appellant "not to do it." Ms. KL did not allege that there was any additional touching or kissing, consensual or otherwise, after she told the appellant "not to do it." Even

---

[8] R. at 514.

[9] R. at 531.

[10] R. at 515.

[11] *Id.*

[12] R. at 514.

[13] R. at 531.

by her account, the appellant ceased sexual contact with her once she manifested a lack of consent. She assumed that he stopped because he could not get an erection, but she could not know that because she never discussed it with the appellant. When they left the beach, they were noticed for the second time that night by HM2 Collins who described them as leaning into each other, laughing and talking. The appellant and Ms. KL rode together in a taxi to Ms. KL's car and they parted ways.

"When weighing the credibility of a witness, this court, like a fact finder at trial, examines whether discrepancies in witness testimony resulted from an innocent mistake, such as a lapse of memory, or a deliberate lie." *United States v. Patrick*, 78 M.J. 687, 715 (N-M. Ct. Crim. App. 2018) (quoting *United States v. Berger*, No. 201500024, 2016 CCA LEXIS 322 at *36 (N-M. Ct. Crim. App. 26 May 2016), *rev'd on other grounds*, 76 M.J. 128 (C.A.A.F. 2017)). Here, it is apparent by their findings on other charged offenses that the members did not believe much of Ms. KL's testimony. They did not believe her testimony concerning her lack of consent to recent sexual activity in the doorway that took place just a few minutes before they got to the beach. When Ms. KL testified, she provided the only evidence that the appellant masturbated on the beach. The members clearly did not believe her because they convicted the appellant of indecent exposure but excepted the word "masturbating." The appellant raises many additional issues and inconsistencies with Ms. KL's testimony casting doubt on her credibility and motives. However, we need not analyze Ms. KL's credibility further because we reach our conclusion by relying on her testimony as given. She consented to the appellant kissing her cheek as he was standing behind her touching her genitalia with his penis. She voiced her objection to having sex with the appellant when she "asked [him] not to do it"[14] and she did not allege that any further sexual contact occurred after that. We do not need to decide whether the appellant stopped because she told him to stop or whether he stopped because he could not get an erection. The record contains no other evidence of this beyond Ms. KL's speculation. The record is also devoid of any evidence of further sexual touching by the appellant after Ms. KL asked him "not to do it." Considering the entire event in context, it would have been reasonable for the appellant to believe that the sexual contact was consensual up until Ms. KL asked him "not to do it."

We also find the appellant's reasonable mistake of fact as to consent, coupled with the fact that he stopped when Ms. KL asked him "not to do it," negates any suggestion that the appellant had the specific intent to sexually assault Ms. KL, the second element of the attempt offense.

---

[14] R. at 515.

After reviewing the record of trial considering the evidence in the light most favorable to the prosecution, we acknowledge that a reasonable fact-finder could have found that all of the elements of abusive sexual contact and attempted sexual assault were established beyond a reasonable doubt. However, after weighing the evidence in the record of trial ourselves and making allowances for not having personally observed the witnesses, we are not convinced that there was any sexual contact with Ms. KL after she voiced her non-consent and we are likewise not convinced beyond a reasonable doubt of the appellant's guilt. Accordingly, we find that the evidence is factually insufficient to convict the appellant of an abusive sexual contact upon, and attempted sexual assault of, Ms. KL. We set aside the convictions for these offenses and consider reassessing the sentence below.

### b. Indecent exposure

The appellant was also convicted of indecent exposure. To support this conviction, the government was required to prove beyond a reasonable doubt that: (1) the appellant exposed his genitals, (2) the exposure was in an indecent manner to wit: masturbating on a public beach, and (3) the exposure was intentional. MCM, Part IV, at ¶ 45c.b.(6). "Indecent manner" is defined as "that form of immorality relating to sexual impurity which is not only grossly vulgar, obscene, and repugnant to common propriety, and tends to excite lust and deprave the morals with respect to sexual relations." Article 120c(d)(6), UCMJ. The military judge instructed the members that they should consider all of the facts and circumstances surrounding the exposure including whether Ms. KL consented to the exposure, whether the exposure was in public or private, and whether there was any prior relationship between the appellant and Ms. KL.[15]

The members found the appellant guilty of indecent exposure but excepted the word "masturbating." The appellant asserts that merely exposing one's genitalia in a public place is not indecent, per se. We agree that it is not per se indecent and we look to case law for objective factors to help define the parameters of the term "indecent manner." We note that three factors have generally been considered to determine whether exposure was done in an indecent manner: (1) lack of consent; (2) involvement of a child; and (3) public visibility. *United States v. Johnston*, 75 M.J. 563, 567 (N-M. Ct. Crim. App. 2016).

In a non-public setting, consensual sexual activity and exposure may be non-criminal conduct even if others may consider it indecent. Because we have determined that the appellant was under a reasonable mistake of fact as to Ms. KL's consent and because the sexual activity was occurring on a public

---

[15] R. at 802.

beach as opposed to a private bedroom, we find that consent, as a factor of indecency, is not helpful in this case. Likewise, Ms. KL is an adult and there are no children involved. Public visibility is the only relevant factor regarding indecency in this case. Although no longer a required element of indecent exposure, an exposure in a public setting may still render an exposure indecent. *Id.*

Here, Ms. KL testified that she assumed the appellant was holding his penis in his hand and she could feel it touching her genitals. Although Ms. KL testified that she saw the appellant's penis, she does not state exactly when she saw it. Rather, when asked twice by the trial counsel if she saw his penis, Ms. KL first replied "yes" but then described in detail how it *felt*. The second time she was asked if she saw his penis, Ms. KL answered: "Well, I just—you know what they feel like. I mean, yes."[16] Finally, Ms. KL stated that after the appellant stopped because he could not get an erection, he stood beside her and masturbated. Again, Ms. KL did not specifically say that she saw the appellant's penis, only that he masturbated. The members could have drawn a reasonable inference that if the appellant was masturbating, his penis would have been exposed. However, even though the members convicted the appellant of indecent exposure by excepting the word "masturbating," that does not necessarily mean that they did not think his penis was exposed—only that they did not believe he was masturbating. To convict, the members only needed to find that the appellant's penis was in fact exposed in an indecent manner, not that Ms. KL necessarily saw it. Ms. KL testified that she knows what a penis feels like on her genitals and that is what she felt. Members could reasonably infer that the appellant's penis was exposed at some time during the sexual activity. Moreover, the members could reasonably conclude that because the appellant's penis was exposed while he was standing behind Ms. KL engaged in sexual contact on a well-lit public beach, the exposure was in an indecent manner.

The appellant next asserts that the members could not find him guilty by excepting the word "masturbating" because that created a fatal variance between what he was charged with and what he was found guilty of. *See United States v. Teffeau*, 58 M.J. 62, 66-7 (C.A.A.F. 2003) (holding that exceptions and substitutions in findings become fatal to a specification where the variance is both material and prejudicial). We disagree.

"Whether there was a fatal variance is a question of law reviewed de novo." *United States v. Treat*, 73 M.J. 335 (C.A.A.F. 2014) (citing *United States v. Salazar*, 44 M.J. 464, 471 (C.A.A.F. 1996)). Absent trial defense counsel objection,

---

[16] R. at 514.

we review findings by exceptions and substitutions for plain error. *Id.* To convince us of plain error the appellant has the burden to establish (1) there was error, (2) the error was plain or obvious, and (3) the plain error affected the appellant's substantial rights. *United States v. Finch*, 64 M.J. 118, 121 (C.A.A.F. 2006).

A variance is material if it "substantially changes the nature of the offense, increases the seriousness of the offense, or increases the punishment for the offense." *Finch*, 64 M.J. at 121. RCM 918(b) allows a finder of fact to make findings by exceptions but the exceptions cannot "substantially change the nature of the offense." *United States v. Useche*, 70 M.J. 657, 661 (N-M. Ct. Crim. App. 2012). Here, the appellant knew the government intended to prove that he exposed his penis and masturbated in front of Ms. KL. The nature of the offense as charged and as excepted did not substantially change. The exposure occurred on the same beach, at the same time, and in the presence of the same person. The variance reduced, not increased, the seriousness of the offense. Instead of finding the more serious act of masturbating on a public beach, the members found mere exposure on a public beach. Finally, the variance had no effect on the potential punishment for indecent exposure. Accordingly, we find that the variance created by the finding as excepted compared to the charged offense, was not material. Moreover, we find no error, much less plain error.

After carefully reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are convinced that a reasonable fact-finder could have found each of the elements of indecent exposure beyond a reasonable doubt. Furthermore, after weighing the evidence in the record of trial and making allowances for not having personally observed Ms. KL, we too are convinced of the appellant's guilt beyond a reasonable doubt. Accordingly, we find the evidence is factually sufficient to sustain a finding of guilty to indecent exposure.

### 2. Offense involving LT KC

The appellant was convicted of abusive sexual contact upon LT KC. To support this conviction, the government was required to prove beyond a reasonable doubt that: (1) the appellant committed sexual contact upon LT KC, by touching, directly or through the clothing, her breast with his hand and by causing her to touch, directly or through the clothing, his buttocks with her hand; (2) the appellant did so by causing bodily harm to LT KC, to wit: grabbing her breast with his hand and grabbing her hand and causing her to touch his buttocks; (3) the appellant did so with the intent to abuse, humiliate, or degrade LT KC, or to arouse or gratify his sexual desire, MCM, Part IV, ¶ 45.b.(7)(b); and (4) the appellant did so without the consent of LT KC. Benchbook at ¶ 3-45-16, note 3.

LT KC is the only witness to testify that the appellant assaulted her. She testified that after changing out of her uniform and into her costume in a bathroom stall, she noticed LTJG EA and spoke briefly with the appellant. She then left to check on another sick female officer in a separate bathroom outside of the ladies' room. LT KC then returned to the ladies' room and noticed LTJG EA sitting against the far wall and the appellant standing between them. LT KC testified that the appellant grabbed and squeezed her left breast while taking her hand and placing it on his buttocks. According to LT KC's testimony, LTJG EA was present for, and should have observed, the sexual contact. LT KC pulled her hand away, walked around the appellant, and sat on the floor to attend to LTJG EA. She eventually left the ladies' room after 20 to 30 minutes and returned to her friends in the main event room. Her demeanor had changed from upbeat to abrupt and very flat. She then demanded that her friends leave with her. Two days later, LT KC reported the incident first to a unit victim advocate, then to her friend, Lieutenant Commander (LCDR) McMahon, and later to a victim's legal counsel. LCDR McMahon testified that he received a text from LT KC on the night of the dining-in stating that the appellant had assaulted her. However, both LCDR McMahon and LT KC deleted the text message exchange.

The government called several witnesses in an attempt to establish the timeline and other events that occurred in the ladies' room. Most of these witnesses were intoxicated to some degree and their testimony is largely divergent regarding who was in the ladies' room at important times during the night. LT KC testified that she brought her clothes with her to the ladies' room and changed before the appellant grabbed her. However, LCDR Strong testified that she brought LT KC's bag to the ladies' room upon LT KC's request. LCDR Strong did not see the appellant in the ladies' room when she brought LT KC's clothes to her but she did see LTJG EA on the floor.

LTJG EA testified that when the appellant assisted her to the ladies' room, she heard voices and knew others were present. She did not see anyone or remember whose voices she heard because she was trying to get to a toilet in order to vomit. When she came out of the bathroom stall, after vomiting, she noticed several individuals present to include LCDR Snider, Commander (CDR) Waters, and Ms. Cornell. After washing her face, LTJG EA remembered sitting down on the floor and that LT KC was rubbing her back. LTJG EA testified that she did not see the appellant assault LT KC.

LCDR Snider testified that she "drank more than [she] would normally drink"[17] and that when she entered the ladies' room, she heard LTJG EA vomiting in one of the bathroom stalls. She then entered the other bathroom stall to use the toilet. When she came out, she saw LTJG EA washing her face at the sink and the appellant was standing nearby rubbing her back. LCDR Snider stated that she then took over rubbing LTJG EA's back until LTJG EA rose up and said, "I feel fine now. It's out."[18] Other people came into the bathroom by this time and then CDR Waters came in looking for LCDR Snider. As LCDR Snider and CDR Waters were leaving the ladies' room, Ms. Cornell was entering. Ms. Cornell testified that she saw LTJG EA on the floor with the appellant rubbing her back and that LT KC and others were also present. After a brief conversation with the appellant, Ms. Cornell escorted the appellant out of the bathroom.

Finally, LT VC testified that she drank "four to five glasses of wine at the dining-in. She stated that she saw the appellant in the ladies' room along with several other people to include LTJG EA, LT KC, LCDR Snider, CDR Waters, LT Chavez, and others. She then saw the appellant "retract his hand back and smack the rear of" an unknown female service member.[19] At that point, she physically grabbed the appellant and yelled at him, "don't do that," or "stop".[20] She described the scene as a "commotion" where everyone was yelling at the appellant telling him to get out of the ladies' room.[21]

In his brief, the appellant asserts that LT KC was upset not because she had been assaulted, but because LTJG EA drank too much. At trial, the appellant's civilian defense counsel also attacked LT KC's credibility for deleting texts after she met with a victims' legal counsel while understanding the importance of preserving evidence. Additionally, the civilian defense counsel argued that LT KC had a motive to get the appellant in trouble because she was upset that the appellant was not supporting her requests for time off and not supporting her efforts to move to the clinic. LT KC was also upset with the appellant because the appellant and another Lieutenant Commander counselled her for being disrespectful to that Lieutenant Commander, who she considered sexist.

---

[17] R. at 626.

[18] R. at 608.

[19] R. at 468, 491.

[20] R. at 491.

[21] R. at 487-8.

"When weighing the credibility of a witness, this court, like a fact finder at trial, examines whether discrepancies in witness testimony resulted from an innocent mistake, such as a lapse of memory, or a deliberate lie." *Patrick*, 78 M.J. at 715-6 (quoting *United States v. Berger*, No. 201500024, 2016 CCA LEXIS 322 at *36 (N-M. Ct. Crim. App. 26 May 2016), *rev'd on other grounds*, 76 M.J. 128 (C.A.A.F. 2017)). LT VC's description of the scene in the ladies' room, in which she claims she saw the appellant smack a female service member's behind, is not corroborated by a single witness to include LT KC, LTJG EA, LCDR Snider, and Ms. Cornell. One month after the dining-in, LT VC told NCIS that she did not see anything occur in the ladies' room. She then testified that a friend restored her memory about what happened.[22] Based on the record, we find LT VC's testimony to be wholly incredible and give it no weight. Even if we believed her testimony, it does not convince us of the appellant's guilt on the specification alleged.

LT KC testified that the appellant grabbed and squeezed her left breast while taking her hand and placing it on his buttock and that LTJG EA was the only other person present in the ladies' room when this happened. However, the testimony of LCDR Snider, a government witness, and Ms. Cornell, a defense witness, directly contradict LT KC's testimony that the only other people present were the appellant and LTJG EA. Their testimony firmly established that LCDR Snider, CDR Waters, Ms. Cornell, and others were constantly present in the ladies' room from the time LTJG EA and the appellant entered the bathroom stall inside the ladies' room until Ms. Cornell escorted the appellant out of the ladies' room. Moreover, neither LTJG EA nor any other witness present in the ladies' room testified that they saw the appellant assault LT KC. We find LT KC's testimony regarding the alleged assault to be unsupportable when explored through the crucible of cross-examination, the logical timeline, and lack of corroboration by other equally credible witnesses.

After reviewing the record of trial considering the evidence in the light most favorable to the prosecution, we acknowledge that a reasonable fact-finder could have relied on LT KC's testimony alone and found beyond a reasonable doubt that the appellant committed an abusive sexual contact upon her. However, after weighing the evidence in the record of trial ourselves and making allowances for not having personally observed the witnesses, we are not convinced that there was a time in this small ladies' room when the appellant could have so brazenly assaulted LT KC without being observed by one, if not several witnesses, and we are not convinced beyond a reasonable doubt of the appellant's guilt. Accordingly, we find that the evidence is factually insufficient to convict the appellant of an abusive sexual contact upon LT KC. We set aside

---

[22] R. at 469.

the conviction for abusive sexual contact upon LT KC and consider reassessing the sentence below.

## C. Member's Question on Specific Instances of Untruthfulness

The appellant contends that the military judge erred when he refused to ask a question, submitted by a member of the panel, of LCDR Owens, a defense witness who testified that Ms. KL was an untruthful person. In accordance with MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 613, MCM, the member submitted a question to the court asking if LCDR Owens could give any specific examples of Ms. KL's untruthfulness when she was intoxicated. The trial counsel objected and during the ensuing Article 39(a), UCMJ, session, it was determined that LCDR Owens believed that Ms. KL was more truthful when drunk. LCDR Owens also believed that Ms. KL had lied to her about having an affair with a married Spanish man who had a child. The trial counsel and civilian defense counsel agreed that the question should not be asked because it opened up MIL. R. EVID. 412 issues and tied Ms. KL's character for untruthfulness to whether she was intoxicated. The military judge asked if the defense concurred with the trial counsel that the line of questioning should not be allowed to go any further and the government's objection to the question should be sustained. The civilian defense counsel replied, "I do, sir."[23]

Appellant was fully aware of the issues presented by the member's question and argued against its use. "[A]s a general proposition of law, 'no objection' constitutes an affirmative waiver of the right or admission at issue." *United States v. Swift*, 76 M.J. 210, 217 (C.A.A.F. 2017) (citing *United States v. Campos*, 67 M.J. 330, 332-33 (C.A.A.F. 2009)). Accordingly, we find that the appellant waived the issue of whether the member's question should have been asked.

In the alternative, the appellant alleges that his defense counsel was ineffective for concurring with the trial counsel and preventing the question from being asked. We will address this claim below where we will address all other allegations of ineffective assistance of counsel.

## D. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees an accused the right to effective assistance of counsel. *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011) (citing *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001)). We review claims of ineffective assistance of counsel de novo. *United States v. Captain, 75 M.J. 99, 102* (C.A.A.F. 2016). The appellant must

---

[23] R. at 732.

show that his defense counsel's performance was deficient and that there is a reasonable probability that the deficient performance prejudiced the appellant at trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We afford the trial defense counsel wide latitude to make tactical choices and grant a "strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. Counsel are presumed competent and to rebut that presumption, the appellant must show specific errors that were unreasonable under the prevailing professional norms. *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987). In order to overcome the presumption of competence, the appellant must convince us that his allegations are true and (1) counsel's actions were unreasonable, (2) counsel's actions fell below the performance normally expected of fallible lawyers, and (3) counsel's performance was ineffective and there is a reasonable probability that absent the errors, there would have been a different result. *Gooch*, 69 M.J. at 362. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Strickland*, 466 U.S. at 697.

*1. Civilian defense counsel was not ineffective for opposing the member's question*

The appellant now argues that his trial defense counsel was ineffective because he did not object to the military judge's decision disallowing the member's question to LCDR Owens regarding specific instances of Ms. KL's untruthfulness. The appellant adds that his trial defense counsel was alternatively ineffective for not attempting to admit impeachment evidence of bias under MIL. R. EVID. 608(c), and constitutionally required under MIL. R. EVID. 412, that purported to establish that Ms. KL had an affair with a married Spanish man who was the father of a child.

Civilian defense counsel did not want the question asked because he knew LCDR Owens knew of no instances when Ms. KL was untruthful except when talking about the affair Ms. KL had with a Spanish man. Additionally, LCDR Owens's opinion that Ms. KL was less truthful when sober than when drunk undercut LCDR Owens's basic opinion that she thought Ms. KL had an untruthful character. At trial, the civilian defense counsel raised the MIL. R. EVID. 412 issue and used it to argue against asking the question. He understood the issue and made a tactical decision that he did not want LCDR Owens to undercut her own opinion of Ms. KL's character. Accordingly, we find the tactical decisions exercised by the civilian defense counsel were not outside the range of reasonableness.

Moreover, because Ms. KL would not speak with the civilian defense counsel before trial, he had no idea how she would explain her previous affair with

the married Spanish man. Despite the appellant's assertions, Ms. KL did not testify that the appellant was "not her type *because* he was married."[24] She stated several times that she did not want to kiss, or have sex with the appellant because, in part, he was married. She also testified that the appellant was not her type. However, Ms. KL did not connect the two disqualifiers. Thus, the evidence would not have impeached Ms. KL by contradiction nor would it somehow expose Ms. KL's bias towards married men with children. Since there is no evidence in the record that Ms. KL even had a bias against married men or married men with children, we will not speculate on how the appellant was prejudiced by that unknown bias.

Given the presumption of competence, the evidence contained in the record, and the lack of evidence admitted by the appellant to show that his trial defense counsel made significant errors, we do not find the civilian defense counsel's performance to be deficient. We cannot say "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [appellant] by the Sixth Amendment. *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001).

*2. Civilian defense counsel was not ineffective for failing to advise appellant that he could "pick and choose" his testimony topics.*

The appellant claims that his counsel failed to fully advise him of his right to testify and specifically that he could limit his testimony to only the events concerning Ms. KL to include addressing the text message exchange between them. The appellant submitted a declaration regarding the performance of his defense counsel and what testimony he would have provided had he known he could limit the topics of examination. Appellant's declaration alleges that his trial defense counsel did nothing to prepare him to testify at trial, they did not conduct any practice direct or cross-examinations, and they did not inform him that he could choose to testify about some events while invoking his right to remain silent regarding other events. The appellant states that he would have testified about the events and circumstance regarding Ms. KL's allegations but he would not have testified regarding the dining-in and LT KC's allegations.

Ms. KL was extensively cross-examined by the civilian defense counsel. Weaknesses in Ms. KL's testimony were exposed with respect to her lack of memory, lack of knowledge of the Rota area, her seemingly willful dodging of even simple uncontroverted facts and locations, and her general lack of perception. Additionally, during the defense case, the civilian defense counsel was able to establish Ms. KL's character for untruthfulness.

---

[24] Appellant's Brief at 34-35 (emphasis added).

After the defense rested without the appellant testifying, the military judge briefly discussed that with the appellant.

> [Military Judge]: Commander Dawkins, you did not testify. Was it your personal decision not to testify?

> [Appellant]: Yes, sir, it was.[25]

Appellant claims that, had he testified, he could have provided additional information to rebut Ms. KL's testimony. Although the testimony of an accused can be powerful, it can also be detrimental. The appellant does not assert that his counsel gave him wrong advice, only that they did not fully advise him regarding partial testimony. However, the appellant's claim is unsupported by his own acknowledgement at trial to the military judge that he made a "personal decision not to testify" and the fact that he expressed no interest in testifying until this appeal. Moreover, taking the stand would have incurred great risk. He could have been cross-examined and impeached. Had he chosen to testify about the incident involving Ms. KL, the scope of cross-examination could have challenged the appellant with evidence that he was exhibiting a consciousness of guilt by his text message response to Ms. KL's claim that he took advantage of her when she was lonely and vulnerable. Finally, even if the appellant limited his testimony on direct examination to only the events involving Ms. KL, or even just to the text messages with Ms. KL, his testimony as a whole would not likely have been so narrowly confined to that selected topic. These are good and reasonable tactical reasons for encouraging an appellant not to testify.

Civilian defense counsel's tactical advice would also have been reasonable given the fact that Ms. KL was a poor witness. *See United States v. MacCulloch*, 40 M.J. 236, 239 (C.M.A. 1994) (citing American Bar Association Standard 4-5.2(b) (1993)) (acknowledging that defense counsel are responsible for making strategic and tactical decisions). There is nothing prohibiting counsel from making a recommendation to their client on whether to testify. Here, nothing that the appellant would have testified about would have likely overwhelmed the evidence against him. The testimony the appellant proffers on appeal would have only partially contradicted Ms. KL's testimony that she saw the appellant masturbate on the beach. However, the members found that the appellant did not masturbate on the beach even though they did find that he exposed his penis. Additionally, the appellant claims that he would have clarified what the text message evidence with Ms. KL meant. This text message conversation was largely favorable for the defense and had been marked as a defense exhibit even though it was not offered into evidence during the defense

---

[25] R. at 770.

case. The appellant now argues that the exchange contains statements that were misperceived by the members. First, when Ms. KL told the appellant that he "took advantage of [her] when [she] was vulnerable and lonely"[26] the appellant responded by asking to meet in person to explain his perspective. The appellant asserts that this response exhibits a consciousness of guilt. Second, the appellant argues that his message: "I heard you loud and clear" was misconstrued by the members to mean that he heard KL say "no" to his sexual advances. However, the members asked for the text message exchange after they began deliberations. The appellant would have had to testify a second time to explain the exchange. He would have been subject to further cross-examination, rebuttal, and possible impeachment adding more risk to that decision. Under these circumstances, it is possible that the appellant's testimony would have been more hurtful than helpful to his case and his civilian defense counsel's strategic and tactical decision to advise him not to testify would have been reasonable.

We need not obtain declarations from the appellant's trial defense counsel or order a post-trial evidentiary hearing because the appellant does not raise an error that would result in relief even if it were resolved in his favor. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). Accordingly, we do not need to determine exactly what advice the civilian defense provided on the subject of partial testimony because we are not persuaded that had the appellant testified as he now proffers, there would have been a different result.

There are no set rules covering the wide spectrum of decisions a trial defense counsel must make in a given case, but to be ineffective, the counsel's performance must have resulted in prejudice. *Strickland*, 466 U.S. at 692. We find Appellant has also failed to meet his burden to establish prejudice. *Captain*, 75 M.J. at 103. Accordingly, we reject the appellant's claims even assuming the assertions in his declaration were true. *Ginn*, 47 M.J. at 248. ("[I]f the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis."). The appellant has not shown there was a reasonable probability that there would have been a different result even if the performance of trial defense counsel fell measurably below the performance ordinarily expected of fallible lawyers. *Gooch*, 69 M.J. at 362 (C.A.A.F. 2011). We therefore conclude that the appellant was not denied effective representation due to the advice, or lack of advice, he received about testifying.

---

[26] Defense Exhibit B.

**E. Sentence Reassessment**

We set aside the appellant's conviction for the attempted sexual assault of Ms. KL and abusive sexual contact upon Ms. KL and LT KC. The appellant was sentenced only to the mandatory minimum required for a conviction of attempted sexual assault—dismissal. The remaining conviction for indecent exposure does not require a mandatory minimum sentence. Consequently, there has been a "[d]ramatic change[ ] in the penalty landscape and exposure." *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013). We conclude that we are unable to reassess the appellant's sentence because we cannot "determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity." *Id.*

## III. CONCLUSION

The guilty findings to the Specification of Charge I and Specifications 2 and 4 of Charge II, and the sentence are **SET ASIDE** and the Specification of Charge I and Specifications 2 and 4 of Charge II are **DISMISSED WITH PREJUDICE**. The remaining finding is **AFFIRMED**. Arts. 59 & 66, UCMJ. The record is returned to the Judge Advocate General for remand to an appropriate convening authority with a sentencing rehearing authorized. Alternatively, if a rehearing on sentence is impractical, the convening authority may approve a sentence of no punishment.

Judge J. STEPHENS concurs.

CRISFIELD, Chief Judge (dissenting in part):

I dissent solely from the court's holding in setting-aside the finding of guilty for abusive sexual contact upon LT KC. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, I am convinced of the appellant's guilt of this offense and can find no reason to set-aside the members' verdict.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court